UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| CODY RAY CASKEY,<br><br>             Plaintiff,<br><br>       vs.<br><br>SOUTH DAKOTA STATE PENITENTIARY,  SOUTH DAKOTA DEPARTMENT OF HEALTH, DR. EUGENE REGIER, IN HIS INDIVIDUAL CAPACITY; RYAN MANSON, CNP, IN HIS INDIVIDUAL CAPACITY; DARIN YOUNG, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; JUSTIN ELKINS, IN HIS INDIVIDUAL AND OFFICIAL CAPACITIES; KAYLA THEILAN, IN HER INDIVIDUAL AND OFFICIAL CAPACITIES; JANE DOES, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES; JOHN DOES, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES; AND DENNIS LAUSENG,<br><br>             Defendants. | 4:14-CV-04010-KES<br><br><br><br>REPORT AND RECOMMENDATION [DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, DOCKETS 53 & 57] |

**INTRODUCTION**

This matter is before the court on *pro se* plaintiff Cody Caskey's amended

complaint pursuant to 42 U.S.C. § 1983 alleging defendants violated his

constitutional rights.  See Docket Nos. 1 & 22.[1]  Pending are motions for

---

[1] The defendants urge the court to disregard the allegations contained in Mr. Caskey's original complaint for purposes of the pending summary judgment motion in light of the usual rule and court's instruction that his amended complaint should include all his intended claims and supercede the original complaint.  See defendants' brief in support of their motion for summary judgment, Docket 58, pp. 7-8.  Mr. Caskey's amended complaint

summary judgment by all defendants.  Docket Nos. 53 & 57.  This case has been referred to this magistrate judge by the Honorable Karen E. Schreier, district judge, for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and her October 16, 2014, standing order. The following is this court's recommendation.

## BACKGROUND

In his original complaint, Mr. Caskey articulated claims for deliberate indifference to his serious medical needs in violation of the Eighth Amendment prohibition against cruel and unusual punishment, and for a violation of the Equal Protection Clause of the Fourteenth Amendment.  See Docket 1 and Judge Schreier's Order Directing Service (Docket 9).    Judge Schreier allowed Mr. Caskey to file an amended complaint, in which he added a claim against defendant Dennis Lauseng for sexual assault in violation of the Eighth Amendment and against defendant Kayla Thelen for deliberate indifference in failing to provide proper counseling/mental health therapy after the alleged assault.

---

made clear, however, that he did not understand his original complaint would be superceded by the amended complaint and that he intended his amended complaint to merely supplement the original complaint.  See Docket 22, "Dr. Eugene Regier and Ryan Manson CNP are being sued for previously entered complaints and also refusing to properly treat narcolepsy . . ."  The Eighth Circuit has instructed many times that a pro se litigant's pleadings should be liberally construed.  See e.g. Jackson v. Nixon, 747 F.3d 537, 541 (8th Cir. 2014).  The defendants will not be prejudiced by the court considering the claims presented in Mr. Caskey's original complaint because they acknowledged in their brief that they understood his intent as well and, therefore, they addressed the merits of those claims in their summary judgment pleadings.  See Docket 58 at p. 7, 8-12. The court therefore declines the defendants' invitation to ignore the allegations contained in Mr. Caskey's original complaint for purposes of the pending summary judgment motion.

2

On April 1, 2015, the defendants made a motion to stay discovery pending their motions for summary judgment based upon the doctrine of qualified immunity.  See Docket 46 and 50.  On May 7, 2015, the court granted the motion, but ordered the defendants to immediately provide Mr. Caskey with copies of his own medical records during his period of incarceration including medical records generated by outside providers.  See Docket 50.

Pursuant to Fed. R. Civ. P. 56(c)(1)(A) and Local Rule 56.1.(A), the defendants filed their motions for summary judgment (Docket Nos. 53 and 57), and statements of undisputed facts, (Docket Nos. 55 and 59) which were supported by briefs, (Docket Nos. 54 and 58) and several affidavits.

The factual allegations contained in defendant Lauseng's statement of undisputed facts (Docket 55) are supported by the affidavit of Robert Anderson (Docket 56), along with attachments, including pertinent portions of Mr. Caskey's deposition (Docket 56-1 and 56-2) and exhibits which were attached to the deposition (Docket 56-3).  The factual allegations contained in defendants' John and Jane Does, Justin Elkins, Ryan Manson, Eugene Regier, Kayla Thelen, and Darin Young's statement of undisputed facts (Docket 59) are supported by three affidavits.  The affidavit of Matthew Naasz (Docket 60) contains two attachments, both (Docket 60-1 and 60-2) are pertinent portions of Mr. Caskey's deposition.[2]  The affidavit of Kayla Thelen (Docket 61) contains

---

[2] Mr. Caskey's deposition and perhaps others were taken before the defendants moved to stay discovery.  See Docket 56-2 (dated March 12, 2015); Id. at 44 (referring to Curtis Baker's testimony); Id. at 50 (referring to Captain Lauseng's testimony).  It does not appear that Mr. Caskey was present for the testimony of Curtis Baker or Captain Lauseng.

six attachments (Dockets 61-1 through 61-6)—all are copies of Mr. Caskey's mental health records for the relevant time frame.  The affidavit of Jessica Schreurs (Docket 62) contains eighteen attachments (Docket 62-1 through 62-18)—all are copies of Mr. Caskey's medical records for the relevant time frame.

In its scheduling order dated January 14, 2015, (Docket 40) the court imposed a deadline for the defendants to file their motion for summary judgment with supporting material (July 1, 2015) and for Mr. Caskey to file any opposition thereto with supporting material (July 22, 2015).  Also attached to the scheduling order were copies of the Local Rules and the pertinent Federal Rules of Civil Procedure, including FED. R. CIV. P. 56.

The defendants timely filed their motions for summary judgment and supporting materials, including their statements of undisputed material facts pursuant to Local Rule 56.1.A.  Mr. Caskey did not respond to the motion for summary judgment nor did he respond to the defendants' statements of undisputed facts as required by Local Rule 56.1.B, other than the undated letter which was received from Mr. Caskey, filed August 28, 2015.   Because Mr. Caskey did not respond to the defendants' statements of undisputed material facts, they are adopted by the court and are deemed admitted pursuant to Local Rule 56.1.D.

**FACTS**

**A.     Parties**

Mr. Caskey was, at the time he filed the instant lawsuit, an inmate at the South Dakota State Penitentiary (SDSP).  <u>See</u> complaint and amended

complaint.  In 2012, he was charged with identity theft and forgery in Brown County, South Dakota.  Caskey deposition, Docket 56-2, p. 8.  He pleaded guilty to those charges and was sentenced to serve five years with three years suspended.  Id. at p. 9.   He arrived at the SDSP in early October, 2012.  Id. at p. 10.  After a parole violation, the suspended portion of his sentence was imposed.  Id.  at p. 9.

During the relevant time frame, Defendant Darin Young was the warden of the SDSP.  See Defendants' Answer, ¶ 4.  Defendant Eugene Regier was employed by the South Dakota Department of Health.  Id. at ¶ 3.  Defendant Ryan Manson was employed by the South Dakota Department of Health as a nurse practitioner at the SDSP.  Id. at ¶ 5.  Defendant Justin Elkins was employed by the South Dakota Department of Social Services at the SDSP.  Id. at ¶ 6.  Defendant Kayla Thelen was employed by the Department of Social Services at the SDSP.  Id. at ¶ 7.  Defendant Dennis Lauseng was employed as a captain with the Department of Corrections (DOC).  See Docket 55 at ¶ 5 citing Caskey deposition, Docket 56-2 at p. 14-15.

## B.  Mr. Caskey's Claim Against Captain Lauseng and Related Facts.

In his amended complaint (Docket 22) Mr. Caskey claims defendant Lauseng sexually assaulted him.  Id. p. 1.  Mr. Caskey asserts the assault occurred while Mr. Caskey was on work release.  Id.  He asserts Mr. Lauseng "swore [him] to secrecy, informing [him] of the power he had in the prison and the damage [he] would suffer should [he] tell anyone."  Id. at p. 2-3. Mr. Caskey did not tell anyone about the assault until after he became aware

5

that Mr. Lauseng had resigned his position at the SDSP.  Id. at p. 3.
Mr. Caskey asserts the two officers he alerted to the assault told him to "keep it
quiet" to prevent retaliation from other prison officials.  Id.

Mr. Lauseng was employed as a captain with the DOC during the time
Mr. Caskey was imprisoned.  Docket 56-2, p. 14-15.  Mr. Caskey knew
Mr. Lauseng because Lauseng was a guard at the penitentiary.  Docket 56-2,
p. 15.  On approximately May 13, 2013, Mr. Caskey was released on the
Community Transition Program (CTP).  Docket 56-2, p. 10.  This program
allows the inmate to leave the prison on weekdays in the mornings, returning
by approximately 6:00 p.m. each day, to get a job and establish himself in the
community.  Id. at p. 10-13.   Instead of working, however, Mr. Caskey went to
a friend's house (Curtis Baker) to "hang out" and use Baker's computer.  Id. at
11.  Mr. Caskey met Baker online.  Id.

At some earlier time, Mr. Lauseng had a sexual encounter with
Mr. Baker.  Docket 56-2 at p. 75-77.  In June, 2013, while Mr. Caskey was still
on the CTP, he began communicating with Mr. Lauseng on a website called
"Manhunt.com."  Docket 56-2 at p. 16.  "Manhunt.com" is a website for gay
men to look for other gay men.  Id. at pp. 16-17.  When Mr. Caskey began
communicating with Mr. Lauseng on the site, he did not know it was
Mr. Lauseng with whom he was communicating because the communication
was anonymous.  Id.  at pp. 19-20.  When Mr. Caskey arranged for a meeting
and gave the person with whom he was communicating his cell phone number
and Curtis Baker's address, however, he asked the person with whom he was

6

communicating to text him a photo.  Id.  When the person complied,

Mr. Caskey immediately recognized Mr. Lauseng.  Id. at p. 22.

Mr. Caskey texted Mr. Lauseng and told him they could not meet, and

not to come over because Mr. Caskey was on the CTP.  Id. at pp. 23-24.

Mr. Lauseng responded by asking who he was corresponding with.  Id. at p. 24.

Mr. Caskey revealed his identity to Mr. Lauseng.  Id.  Mr. Lauseng did not

communicate any further with Mr. Caskey until he knocked on the apartment

door about thirty minutes later.  Id. at p. 24.  Mr. Caskey opened the door and

allowed Mr. Lauseng to come in.  Id. at pp. 25-26.  Mr. Lauseng was not in

uniform, nor was he wearing his badge or carrying a gun.  He did not arrive at

the apartment in a law enforcement vehicle.  Id. at p. 27, 29.

Mr. Lauseng and Mr. Caskey went to a bedroom in the apartment and

engaged in fellatio.  Id. at 30.  Mr. Caskey was not aroused because he was

frightened knowing Lauseng was a captain at the DOC.  Id. at p. 30.[3]

Nevertheless, Mr. Caskey did not protest nor attempt to push Mr. Lauseng

away.  Id. at p. 31.  After the encounter, Mr. Lauseng told Mr. Caskey not to

tell anyone, because he (Lauseng) had a lot of power at the SDSP.  Mr. Lauseng

never physically harmed Mr. Caskey, nor did he write him up for any violations

---

[3] Though not a part of the defendants' statement of undisputed facts,
Mr. Caskey also indicated in the portions of the deposition produced by the
defendants that he believed Mr. Lauseng may have been on the website and
come to Curtis Baker's apartment as a "set up" to arrest him or otherwise
punish him or revoke his CTP status for not complying with the requirements
of the CTP program by hanging out at the apartment and surfing the internet
rather than working.  He cited his fear of Lauseng's authority as the reason for
allowing Lauseng into the apartment and participating in the sex act.  Docket
56-2, p. 25-35.

at the SDSP after the sexual encounter.  Id. at 57.  At a date unknown to

Mr. Caskey, Mr. Lauseng resigned his position at the SDSP.  Id. at p. 41-42.

When Mr. Caskey learned of Captain Lauseng's resignation, he notified Major

Crystal Van Vooren (Special Security) of the June 2013 sexual encounter.  Id.

at p. 41-42.  Though he knew Mr. Lauseng had resigned from the SDSP before

he filed this civil lawsuit, Mr. Caskey did not initially name Captain Lauseng as

a defendant.  Id. at p. 42-44.  Mr. Caskey named Captain Lauseng in the

amended complaint which was filed in July, 2014.  Docket 22.

### C.   Mr. Caskey's Medical Conditions and Deliberate Indifference Claims And Related Facts

#### 1. Spinal Surgery Claims

In his complaint, Mr. Caskey claimed he was "scheduled for a spinal

surgery by Dr. Kidwai" at the time of his arrest in Brown County, South

Dakota.  Docket 1, p. 4.  He claims the medical defendants failed to comply

with outside provider's recommendations and have "knowingly and willingly

allowed [him] to suffer."  Id. p. 2.  He asserts he is in "constant pain."  Id. at

p. 4.  He claims he has only been provided over-the-counter pain medication

which provides him no relief and that he is unable to keep his HIV medication

down.  Id. [4]

Medical records from St. Luke's emergency room in Aberdeen, South

Dakota indicate Mr. Caskey was seen by Dr. Kidwai on June 23, 2012.  Docket

62-7.  Mr. Caskey indicated to the ER staff his back pain had been present for

---

[4] Mr. Caskey is HIV positive.  Docket 56-2 at 49.  He does not specifically allege the treatment he has received for his HIV condition since his incarceration has been inadequate.

8

years.  Surgery was discussed as an option.  Id.  Later records from St. Luke's indicate Mr. Caskey refused a recommended MRI on June 24, 2012.  Docket 62-8.  Mr. Caskey was encouraged to seek further treatment, which may have included surgery.  Docket 62-9.  The Avera Neurosurgery Group in Aberdeen, however, had no records for Mr. Caskey.  He was seen only in the emergency room.  Docket 62-10.

At Mr. Caskey's intake into the SDSP, defendant Ryan Manson, CNP evaluated Caskey's complaints of neck and back pain as follows:

> In regards to patient's cervical spine patient does have a fairly normal exam, other than the subjective complaints of pain. Patient is noted to be twisting his head to the left and right with full range of motion throughout the exam, which is suspicious considering his stated pain level.

Docket 62-11.  Ryan Manson ordered x-rays of Mr. Caskey's cervical spine on October 22, 2012, and he ordered an MRI of Mr. Caskey's cervical spine on December 7, 2012.  Docket 62-12 & 62-13.[5]

---

[5] The physician's interpretation of the cervical spine x-ray was "Normal alignment. No acute fracture.  Hypertrophic osteophytic changes are demonstrated at the midline C1-2 articulation, but the bony cranicervical junction and odontoid process are, otherwise, unremarkable.  AP bony canal diameter is normal throughout.  Disc space narrowing is mild and C6-7 and there is mild ventral osteophytosis at this level.  No osseous lytic or blastic lesions are evident.  Prevertebral soft tissues maintain normal thickness. Imaged lung aspices are unremarkable.  Imaged portions of the mandible and calvarium are unremarkable."  Docket 62-12.

The physician's interpretation of the cervical MRI was "[t]here is disc dehydration with an extradural defect which extends to contact the cervical spinal cord and degenerative reactive marrow change at the C6-7 level.  The vertebral body heights are maintained with no subluxation.  There is loss of normal cervical lordosis.  The more superior as well as inferior interspace heights are well maintained with no additional extradural defects.  The cervical and thoracic spinal cord appear within limits of normal.  C2-C3 and C3-C4:  No

Dr. Regier saw Mr. Caskey on November 19, 2013.  Dr. Regier's notes from that date state in part:

> Today he states he has not been feeling well at any time since his last visit here in health services and states his symptoms are exactly the same as they were when he was previously seen.  He states he does not believe he is receiving adequate health care at all.  We have informed him we have engaged the services of an infectious disease specialist because of the complex nature of HIV and treatment thereof.  He is basically unclear as to what he believes should be done additionally but he just appears to be very disgruntled regarding health services and his care.

Docket 62-6, p.1.  Dr. Regier also saw Mr. Caskey on January 8, 2015.

Dr. Regier's notes on that date state in part:

> He states he was hospitalized for about 6 weeks and states he had fractures of 2 lower cervical vertebrae as well as some bulging discs.  He states he was scheduled for cervical spine surgery via an anterior approach but he states the procedure was never performed and that he was subsequently incarcerated.  The patient did have an MRI of his cervical spine on 12/7/12 and that was done after his incarceration.  The impression was that of degenerative spondylosis most pronounced at C6-7 with left central annular protrusion contacting the cervical spine cord but with no exudate nerve root impingement.  It is not clear what type of surgery the patient was to have done.  The patient has been taking some Neurontin for probable neuropathic pain and that dosage has been recently increased.  Currently he is on 600 mg at supper and 900 mg at bedtime daily.

Docket 62-14 at p. 1.  Dr. Regier evaluated Mr. Caskey's back pain on

February 25, 2015.  Docket 62-15.  Dr. Regier's note of that date indicates

Mr. Caskey had C-spine x-rays in January, 2015.  Dr. Regier adjusted

---

central or lateral foraminal stenosis.  C4-C5 and C5-C6:  Slightly bulging annulus.  C6-C7 and C7-C8:  There is a central subligamentous disc protrusion slightly lateralizing towards the left contacting the cervical spinal cord. No significant foraminal narrowing or definitive exiting nerve root impingement.  C7-T1:  No central or lateral foraminal stenosis."

Mr. Caskey's medication.[6]  He also ordered a cervical epidural block.  Docket 62-15 at p. 2.  The epidural block was approved on February 25, 2015, and performed on March 23, 2015.  Docket 62-16 & 62-17.

## 2. Narcolepsy Claims

In his amended complaint (Docket 22), Mr. Caskey also alleges Dr. Regier and Ryan Manson, CNP refused to properly treat him for his narcolepsy condition.  Docket 22 at p. 1.  Mr. Caskey asserts the recommendations of his outside medical provider (Dr. Hericks) are not being followed by Dr. Regier and Ryan Manson.  Id.

On December 4, 2012, Dr. Davidson, a psychiatrist, indicated he would prefer Mr. Caskey undergo sleep lab diagnostics for the diagnosis of narcolepsy.  Docket 61-5, p. 2.  Mr. Caskey underwent a multiple sleep latency test on January 30, 2013 at Avera McKennan Hospital in Sioux Falls.  The test revealed findings consistent with narcolepsy.  Docket 61-1.  Following this finding, the continuation of Mr. Caskey's Adderall prescription was approved.  Docket 62-2, 62-3.  A June 2013 note from Dr. Davidson indicates Mr. Caskey had been compliant with his Adderall for narcolepsy.  Docket 61-4.

---

[6] Dr. Regier adjusted Mr. Caskey's medications.  Mr. Caskey indicated he did not believe Gabapentin had been effective.  (Gabapentin is the generic name for Neurontin and is a drug which, according to http://www.rxlist.com/neurontin-drug/indications-dosage.htm, last checked September 3, 2015, is prescribed to treat nerve pain).  Dr. Regier eliminated the Gabapentin, added an anti-nausea drug (Zofran), added Lyrica (a pain medication) and eliminated Meloxicam, a non-steroidal anti-inflammatory.  He continued Mr. Caskey's authorization for Ibuprofen, 600 mg four times per day as needed.  See Docket 62-15 at p. 2.

11

On June 28, 2013, Dr. Davidson noted it had been discovered Mr. Caskey was receiving two different prescriptions for Adderall: one from the SDSP medical staff and one from an outside provider.  Docket 61-3; Docket 62-4; Docket 62-5, p. 1.  Because of this misuse of "high-risk, controlled substances" Mr. Caskey's physician-patient relationship with the outside provider (Dr. Hericks from Avera-McKennan Pulmonary & Sleep Medicine in Sioux Falls) was terminated in July, 2013.  Docket 62-4.   On November 19, 2013, Mr. Caskey told Dr. Regier he wished to be treated for his narcolepsy by a "narcolepsy specialist" rather than the mental health providers at the SDSP. Docket 62-6, p. 1.

Mr. Caskey saw Dr. Pavlis on February 4, 2015.  Mr. Caskey requested an increase in his then-current narcolepsy medication (Provigil).  Docket 61-1, p. 1.  Dr. Pavlis agreed to increase Mr. Caskey's Provigil dosage from 200mg to 300mg daily.  Id. at p. 2.

**3. Counseling Claims**

In his amended complaint (Docket 22), Mr. Caskey alleges after he was sexually assaulted by Captain Lauseng, the defendants provided inadequate mental health care/counseling to deal with the emotional distress he suffered as a result of the assault.  Docket 22 at p. 2.  Mr. Caskey asserts prison officials referred him to a victim's advocate who visited with him, but the DOC did not approve the services she provided so her services were discontinued. Id.  Mr. Caskey also alleges defendant Kayla Thelen talked to him twice but offered no help other than group therapy.  Id.  He asserts Justin Elkins, Kayla

12

Thelen and the Jane/John Doe defendants did not properly handle his mental health care did not provide adequate therapy.  Id. at p. 3.  Mr. Caskey asserts he was "left to suffer the consequences of coming forth with the truth alone." Id. at p. 2.

On October 30, 2013, Mr. Caskey told Kayla Thelen he had been sexually abused while he was on the CTP.  Docket 61, ¶ 4.  Ms. Thelen told Mr. Caskey about a resilience group she was starting the next day.  Id. at ¶; Docket 61-6. The objective of the resilience group was to provide coping skills related to past trauma.  Docket 61, ¶ 5.  Mr. Caskey indicated he would like to join the group. Id.  Later that same day, however, Mr. Caskey attempted to harm himself, and was placed on a mental health watch.  Docket 61, ¶ 6; Docket 61-2. Mr. Caskey was placed in a different housing unit because of the incident and was therefore unable to join the group. Docket 61, ¶ 7.  Mr. Caskey testified he chose not to join the group because "the class was full of special needers talking about their crime . . . that was in no way going to be effective for me." Docket 60-2, p. 71.  In his deposition, Mr. Caskey further explained he did not believe Kayla Thelen's efforts to help him were adequate because she did not address his sexual assault claim.  Id. at pp. 69-71.  He was aware, however, that he could kite mental health as needed to discuss the issue.  Docket 61-6. Prison records indicate no further communication between Kayla Thelen and Mr. Caskey regarding Mr. Caskey's sexual assault claim.  Docket 61 at ¶ 8. Mr. Caskey acknowledges he did not attempt to contact Kayla Thelen again about his sexual assault claim.  Docket 60-2 at p. 69.  Mr. Caskey had no

direct interaction with Justin Elkins about his mental health claims.  Rather, Mr. Caskey named Mr. Elkins in this lawsuit because Mr. Elkins signed a grievance regarding Mr. Caskey's medications.  Docket 60-2 at pp. 72-73.[7]

**D.    Mr. Caskey's Equal Protection Claims and Related Facts**

In his original complaint (Docket 1) Mr. Caskey alleges Dr. Regier discriminated against him because of his HIV positive medical condition and because of his sexual orientation.  Docket 1, p. 5.  He generally asserts Dr. Regier's discriminatory bias has influenced the manner in which he has treated Mr. Caskey's health conditions during Mr. Caskey's incarceration at SDSP.  Id.   In support of this claim, Mr. Caskey cites a comment he claims Dr. Regier made during a consultation in which Dr. Regier stated "that is why HIV is bad, you have to stop spreading it."  Docket 1 at p. 5.

## DISCUSSION

**A.    Summary Judgment Standard.**

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The court must view the facts, and inferences from those facts, in the light most favorable to the nonmoving party.

---

[7] A review of Mr. Caskey's mental health records reveals the defendants prescribed anxiety and depression medications for him both before and after the date of the claimed sexual assault.  See Docket 61-1, 61-5.  It appears the grievance in which Mr. Elkins was involved occurred when one of Mr. Caskey's mental health providers switched his narcolepsy medication from his preferred medication (Adderall) to Provigil, sometime after the incident in which it was discovered Mr. Caskey was receiving Adderall from two different providers.  See Docket 60-2 at pp.72-73; Docket 61-1, p. 1; Docket 38.

See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986)
(citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v.
Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam).
Summary judgment will not lie if the evidence is such that a reasonable jury
could return a verdict for the nonmoving party.  See Anderson v. Liberty Lobby,
Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64,
66 (8th Cir. 1994).

The burden is placed on the moving party to establish both the absence
of any genuine issue of material fact and that the moving party is entitled to
judgment as a matter of law.  FED. R. CIV. P. 56(a).  Once the movant has met
its burden, the nonmoving party may not simply rest on the allegations in the
pleadings, but must set forth specific facts, by affidavit or other evidence,
showing that a genuine issue of material fact exists.  Anderson, 477 U.S. at
256; FED. R. CIV. P. 56(e) (each party must properly support its own assertions
of fact and properly address the opposing party's assertions of fact, as required
by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for
purposes of a motion for summary judgment.  Anderson, 477 U.S. at 248.
"Only disputes over facts that might affect the outcome of the suit under the
governing law will properly preclude the entry of summary judgment.  Factual
disputes that are irrelevant or unnecessary will not be counted." Id. (citing 10A
CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, Fed. Practice &
Procedure § 2725, at 93–95 (3d ed. 1983)).  "[T]he mere existence of *some*

15

alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247–48.  Essentially, the availability of summary judgment turns on whether a proper jury question is presented: "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

South Dakota Local Rule 56.1.D. states, "**D. Effect of Omission: Sanction.** All material facts set forth in the movant's statement of material facts will be deemed to be admitted unless controverted by the opposing party's statement of material facts."

That the court adopts the defendants' facts because Mr. Caskey did not dispute them does not necessarily allow the court to summarily grant the defendants' motion.  "Even if a motion for summary judgment on a particular claim stands unopposed, the district court must still determine that the moving party is entitled to judgment as a matter of law on that claim." Interstate Power Co. v. Kansas City Power & Light Co., 992 F.2d 804, 807 (8th Cir. 1993).

**B.    Official Capacity Claims**

Mr. Caskey sues all defendants in both their official capacities and their individual capacities.  See Docket No. 1 & 22.  Official-capacity claims against state officials are treated as suits against the State or its political subdivision

16

itself.  <u>Kentucky v. Graham</u>, 473 U.S. 159, 165 (1985).  "Because the real party

in interest in an official capacity suit is the governmental entity and not the

named official, 'the entity's "policy or custom" must have played a part in the

violation of federal law.' "  <u>Hafer v. Melo</u>, 502 U.S. 21, 25 (1991).  This is

because governmental entities can only be held liable under § 1983 to the

extent the constitutional deprivation was made pursuant to official policy or

custom of the city, county or other local governmental unit.  See <u>Monell v. New</u>

<u>York City Dept. of Soc. Servs.</u>, 436 U.S. 658, 689-90 (1978).

> "To establish a claim for 'custom' liability, [a plaintiff] must
> demonstrate (1) the existence of a continuing, widespread
> persistent pattern of unconstitutional misconduct by the
> governmental entity's employees; (2) deliberate indifference to or
> tacit authorization of such conduct by the governmental entity's
> policymaking officials after notice to the officials of that
> misconduct; and (3) that plaintiff was injured by acts pursuant to
> the governmental entity's custom, i.e., that the custom was a
> moving force behind the constitutional violation.

<u>Johnson v. Douglas  County Medical Department</u>, 725 F.3d 825, 828 (8th Cir.

2013) (citation omitted, punctuation altered).  In official capacity suits, the only

immunity available to the individually-named defendants are those immunities

that the governmental entity possesses—i.e. usually Eleventh Amendment

immunity.  <u>Hafer</u>, 502 U.S. at 25.  Suits against defendants in their individual

capacities, however, need not show that the defendant acted pursuant to any

government policy or custom; the defendant is also entitled to assert personal

immunity defenses such as the defense of qualified immunity.  <u>Id.</u>

Supervisors may not be held liable on a theory of *respondeat superior*—

vicarious liability deriving from one's duty or power to supervise a subordinate.

Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).  A supervisor may be held liable only for his or her own direct conduct resulting in the deprivation of a plaintiff's constitutional right.  Id. at 676-77.  The state of South Dakota has immunity from suit in this federal forum under the Eleventh Amendment to the United States Constitution.  Kentucky v. Graham, 473 U.S. 159, 170 (1985).

In Will v. Michigan Dept. of State Police, 491 U.S. 58, 60-61 (1989), a plaintiff brought a § 1983 claim against various state officials in their official capacity.  Section 1983 provides a cause of action for deprivations of constitutional rights done by a "*person*" acting under color of state law.  Id. at 60, 60 n.1 (citing 42 U.S.C. § 1983).  The Court held that "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."  Id. at 71 (citing Brandon v. Holt, 469 U.S. 464, 471 (1985)).  "As such," the Court continued, "it is no different from a suit against the State itself."  Id. (citing Graham, 473 U.S. at 165-55; Monell v. New York City Dept. of Social Servs., 436 U.S. 658, 690, n.55 (1978)).  The Will Court held, therefore, that "neither a State nor its officials acting in their official capacities are 'persons' [amenable to suit] under § 1983."  Id.  Finally,

> [I]n accordance with Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed.2d 714 (1908), the Eleventh Amendment bars damages claims against the states, but generally does not bar claims for prospective injunctive relief against public officials in their official capacities.  Monroe v. Ark. State Univ., 495 F.3d 591, 594 (8th Cir. 2007); see, Nix v. Norman, 879 F.2d 429, 432 (8th Cir. 1989) ("[T]he Eleventh Amendment bars suits by private parties 'seeking to impose a liability which must be paid from public funds in the state treasury.' ")(quoting Edelman v. Jordan, 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974))).

Serna v. Goodno, 567 F.3d 944, 952 (8th Cir. 2009) (noting that neither Eleventh Amendment nor qualified immunity bars official capacity claims for injunctive relief).

The Will analysis and holding apply squarely to Mr. Caskey's official capacity § 1983 claims for money damages.  All named defendants are either state entities or employees of the state of South Dakota.  As such, a suit against them or in their official capacities for money damages is tantamount to a suit against the state of South Dakota itself.  Such claims are not recognized under 42 U.S.C. § 1983.  Accordingly, summary judgment should be granted to the state defendants or state employees in their official capacities on Mr. Caskey's claims which request monetary relief.

## C.     The Law of Qualified Immunity.

In order to show a *prima facie* case under 42 U.S.C. § 1983, Mr. Caskey must show (1) defendants acted under color of state law and (2) " 'the alleged wrongful conduct deprived him of a constitutionally protected federal right.' " Zutz v. Nelson, 601 F.3d 842, 848 (8th Cir. 2010) (quoting Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009)).

Qualified immunity protects government officials from liability and from having to defend themselves in a civil suit if the conduct of the officials "does not violate clearly established statutory or constitutional rights."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity is immunity from suit, not just a defense to liability at trial.  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  "Qualified immunity protects government officials performing

discretionary functions from liability for civil damages insofar as their conduct does not violate  . . . statutory or constitutional rights of which a reasonable person would have known."  <u>Cox v. Sugg</u>, 484 F.3d 1062, 1065 (8th Cir. 2007) (citation omitted, punctuation altered).

To determine whether an official is entitled to qualified immunity, two factors must be determined:  (1) whether the facts that plaintiff has shown make out a violation of a constitutional right and (2) whether that constitutional right was "clearly established" at the time of the official's acts. <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001).  If the court finds that one of the two elements is not met, the court need not decide the other element, and the court may address the elements in any order it wishes "in light of the circumstances of the particular case at hand."  <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009). Defendants are entitled to qualified immunity if the answer to either of the <u>Saucier</u> prongs is "no."

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.' "  <u>Stanton v. Sims</u>, ___ U.S. ___, 134 S. Ct. 3, 5 (2013) (quoting <u>Ashcroft v. al-Kidd</u>, ___ U.S. ___, 131 S. Ct. 2074, 2085 (2011) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986))). " 'We do not require a case directly on point' before concluding that the law is clearly established, 'but existing precedent must have placed the statutory or constitutional question beyond debate.' " <u>Stanton</u>, 134 S. Ct. at 5.   Further, "[t]o overcome qualified immunity, a plaintiff must be able to prove that 'every

reasonable official would have understood that what he is doing violates' a constitutional right, and that the constitutional question was 'beyond debate.' " Story v. Foote, 782  F.3d 968, 970 (8th Cir. 2015) (quoting al-Kidd, 131 S.Ct. at 2083; Lane v. Franks, 134 S.Ct. 2369, 2383 (2014); and Stanton, 134 S.Ct. at 7).

Qualified immunity does not shield the defendants from claims for equitable relief.  Grantham v. Trickey, 21 F.3d 289, 295 (8th Cir. 1999).  If the plaintiff has failed to establish the violation of his constitutional or statutory rights by the named defendants, "[t]his conclusion necessarily resolves the merits of [plaintiff's] claims for equitable relief as well."  Cox, 484 F.3d at 1068. As such, even if equitable relief against defendants in their official capacities were theoretically possible, such relief would not be afforded if plaintiff's claims of constitutional and statutory violations fail on their merits.

**D.    Defendants Young and Elkins are Entitled To Summary Judgment.**

Mr. Caskey has named Warden Darin Young and Justin Elkins as defendants in this lawsuit.  The claims Mr. Caskey articulates in his complaint and amended complaint against Warden Young and Justin Elkins are based strictly upon their supervisory roles within the DOC.

The allegations against these supervisory DOC employees in Mr. Caskey's amended complaint[8] are scant.  Warden Young and Justin Elkins are  named in the caption, and described as a parties.  Mr. Caskey's allegation against Warden Young is that he refused to correct complaints in the

---

[8] He did not name them in his original complaint.

"numerous grievances filed on these injustices. He signed every grievance denying administrative remedy." Docket 22 at p. 1. Mr. Caskey's allegation against Mr. Elkins is that he was "involved in the mental health service dept. at the DOC," and that he is being sued for "not properly handling [his] case and not providing adequate therapy." Docket 22 at p. 3. In his deposition, however, Mr. Caskey acknowledged Justin Elkins was not directly involved in providing medical or mental health care, but that Mr. Elkins likewise merely responded to Mr. Caskey's administrative grievances when his Adderall was discontinued.[9] See Docket 60-2, p. 72-73.

"In the section 1983 context, supervisor liability is limited. A supervisor cannot be held liable, on a theory of respondeat superior, for an employee's unconstitutional actions." White v. Holmes, 21 F.3d 277, 280 (8th Cir. 1994). Rather, a supervisor incurs liability for an Eighth Amendment violation when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation. Choate v. Lockhart, 7 F.3d 1370, 1376 (8th Cir. 1993). "The supervisor must know about the conduct, and facilitate it, approve it, condone it, or turn a blind

---

[9] For reasons explained below, the decision to discontinue Adderall and substitute Provigil in its place does not rise to the level of deliberate indifference. In his Answer, defendant Elkins indicates he is employed by the South Dakota Department of Social Services. Though his position with the South Dakota Department of Social Services is not specified, it appears Mr. Elkins, unlike Warden Young, *might have* possessed expertise which *might have* allowed him to substitute his judgment for that of whomever decided to change Mr. Caskey's medication. But because the court finds the change in medication does not rise to deliberate indifference, neither does Mr. Elkins' denial of Mr. Caskey's grievance regarding the change.

eye for fear of what [he or she] might see." Ripson v. Alles, 21 F.3d 805, 809 (8th Cir. 1994) (citations omitted).

> Further,

> [b]ecause vicarious liability is inapplicable to § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution. Ashcroft v. Iqbal, 556 U.S. 662 (2009). Thus, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. As we have held, a supervising officer can be liable only if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation.

Parrish v. Ball, 594 F.3d 993, 1001 (8th Cir. 2010) (citation omitted, internal punctuation altered). Mr. Caskey's claims fall short. No conduct-specific information surfaced regarding these supervisory employees throughout the course of the summary judgment proceedings.

The only conduct-specific mention Mr. Caskey makes of these defendants regarding the claims in this lawsuit are his conclusory allegations in the amended complaint and his explanation in his deposition that they insufficiently responded to his grievances regarding his medical and/or mental health care. "Failure to process or investigate grievances, *without more*, is not actionable under § 1983." Thomas v. Banks, 584 Fed. Appx. 291 (8th Cir. 2014) (emphasis added); Harris v. Caruso, 465 Fed. Appx. 481, 487 (6th Cir. 2012). Thomas does not foreclose the possibility that a supervisor's involvement by virtue of responding to a grievance, in addition to other facts, might subject him or her to liability in an individual capacity. The evidence cited by Mr. Caskey in this case, however, is insufficient. Mr. Caskey does not

23

allege Warden Young has any medical expertise whatsoever that would qualify him to override the decisions of the medical providers which were the subject of the grievances.  Dubois v. Dooley, 277 Fed. Appx. 651, 652 (8th Cir. 2008) (no deliberate indifference by warden where warden's only involvement was to respond to grievances, and warden may not substitute his judgment for medical professional's prescribed treatment).

 "[B]ecause allegations alone are insufficient to survive a summary judgment motion, a plaintiff at this  . . . stage of the litigation must 'set forth by affidavit or other evidence specific facts, which for the purposes of the summary judgment motion will be taken as true.' "  Constitution Party of South Dakota v. Nelson, 639 F.3d 417, 421 (8th Cir. 2011) (citing FED. R. CIV. P.  56). See also, Gallagher v. Magner, 619 F.3d 823, 832 (8th Cir. 2010) ("mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment.") citing  Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007)). Mr. Caskey's only responses on record as to the liability of Young and Elkins are his complaint and his deposition testimony.  Neither of these responses point to any fact other than Young and Elkins responding to Mr. Caskey's administrative requests.  This, even if true, is insufficient to establish Young and Elkins' liability.

 Finally, Mr. Caskey has not shown that defendants Darin Young and Justin Elkins were "plainly incompetent" or purposely violated his constitutional rights when they denied his grievances regarding his medical or

mental health care.  They are therefore entitled to qualified immunity.
Stanton, 134 S. Ct. at 5; al-Kidd, 131 S. Ct. at 2085; Malley, 475 U.S. at 341.
The court therefore recommends summary judgment be granted to defendants
Darin Young and Justin Elkins.

**E.    Defendants Dr. Regier, CNP Manson, Kayla Thelen and Does are
entitled to Summary Judgment.**

Mr. Caskey asserts Dr. Regier, CNP Manson, Kayla Thelen and
Jane/John Does were all deliberately indifferent to his serious medical needs.
Mr. Caskey's assertions against Dr. Regier and CNP Manson center on his
claim that an outside provider recommended spine surgery but Regier and
Manson refused to abide by the outside provider's recommendation.
Mr. Caskey also alleges Dr. Regier and CNP Manson were deliberately
indifferent in the manner in which they treated Mr. Caskey's narcolepsy
condition.  He alleges Dr. Regier discriminated against him based on his HIV
status and his sexual orientation.  Mr. Caskey asserts Kayla Thelen and the
Doe defendants were deliberately indifferent because they failed to adequately
care for Mr. Caskey after he reported the sexual assault by Captain Lauseng.

"[D]eliberate indifference to serious medical needs of prisoners
constitutes 'the unnecessary and wanton infliction of pain' proscribed by the
Eighth Amendment."  Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting
Gregg v. Georgia, 428 U.S. 153, 173 (1976)).  "This is true whether the
indifference is manifested by prison doctors in their response to the prisoner's
needs or by prison guards in intentionally denying or delaying access to
medical care or intentionally interfering with the treatment once prescribed."

25

Id. at 104-05.  "[T]his does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment."  Id. at 105.  "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  Id. at 106.  Allegations of negligence are not enough to state a claim. Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000) (prisoner must show more than gross negligence and more than disagreement with treatment decisions).

Deliberate indifference requires the court to make both an objective and a subjective evaluation.  Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing Coleman v. Rahja, 114 F.3d 778, 784 (8th Cir. 1997)). Mr. Caskey is required to show (1) that he suffered objectively serious medical needs and (2) that defendants actually knew of but deliberately disregarded those needs.  Id. (citing Coleman, 114 F.3d at 784).  "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention."  Coleman, 114 F.3d at 784.  To establish liability, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994).  When a prisoner alleges that a delay in treatment violates the Eighth Amendment deliberate indifference standard, he "must place verifying medical evidence in the record to establish

the detrimental effect of the delay in medical treatment to succeed." <u>Crowley v. Hedgepeth</u>, 109 F.3d 500, 502 (8th Cir. 1997)(citation omitted).

Mr. Caskey's deliberate indifference claim against Dr. Regier and CNP Manson as to their medical care regarding Mr. Caskey's spinal condition does not survive summary judgment.  The record evidence shows Mr. Caskey saw Dr. Kidwai in the Avera St. Luke's emergency room in June, 2012, complaining of long-standing spine pain, worse lately.  Docket 62-7.  Dr. Kidwai discussed "various options of management" with Mr. Caskey, including possible surgery, and recommended further testing.  <u>Id.</u>  Dr. Kidwai candidly told Mr. Caskey, however, that he was a high risk surgical candidate.  <u>Id.</u>  Another physician was going to assess Mr. Caskey's candidacy for surgery.  <u>Id.</u>  Mr. Caskey, however, declined the further testing Dr. Kiwai recommended and then left Avera St. Luke's.  Docket 62-8.  He told Dr. Kidwai he had not decided what he wanted to do and that he wished to be discharged.  <u>Id.</u> ; Docket 62-9.

Upon his admission to the SDSP, Mr. Caskey told the medical providers of Dr. Kidwai's recommendation for possible surgical intervention.  Though they did not order surgery, they did (shortly after Mr. Caskey's October, 2012 admission to the SDSP) order diagnostic tests (including cervical spine x-rays and MRI) so they could understand the nature of Mr. Caskey's medical problems and make an independent medical judgment regarding what type of treatment would be appropriate for his condition.  The cervical spine x-rays— performed in October, 2012-- showed "no acute fracture or malalignment" and "mild disc space narrowing" along with "mild ostephytosis."  Docket 62-12 at

p. 1.  The MRI—performed in December, 2012-- showed "degenerative spondylosis  . . . with left central annular protrusion contacting the cervical spinal cord but with no exiting nerve root impingement. There is no abnormal intramedullary signal within the spinal cord." Docket 62-13, p. 2.  When Dr. Regier summarized Mr. Caskey's history of back pain in 2015, he noted these test results and that there was a disc protrusion but no nerve root impingement.  Docket 62-14 p. 1.  Dr. Regier also noted Mr. Caskey had, while incarcerated, been taking Neurontin for pain and the dose had recently been increased.  Mr. Caskey's current dosage was 600 mg at supper and 900 mg at bedtime. Dr. Regier ordered updated C-spine x-rays, which showed advanced disc degeneration and osteoarthritis.  Docket 62-15 at p. 1.  When Mr. Caskey reported the Neurontin it was ineffective, Dr. Regier requested authorization for a cervical epidural block, which was performed by Dr. Scott Lockwood on March 23, 2015.  Docket 62-14 at p. 2; Docket 62-17, p. 1.

Mr. Caskey's deliberate indifference claim against Dr. Regier and CNP Manson appears to rest upon his assertion they did not follow and/or disagreed with the judgment of his pre-incarceration doctors that surgery was necessary.  However, even though Mr. Caskey is no longer incarcerated at SDSP, he has provided no medical records or affidavits from outside medical care providers that would demonstrate the judgment of Dr. Regier and/or CNP Manson was in error.  In addition, even if he had provided such affidavits or evidence, prison health care providers are not required to provide medical care that is "as extensive as a private health care provider" might have offered.

Logan v. Clarke, 119 F.3d 647, 650 (8th Cir. 1997).  And the failure of prison health care to match that of a private provider does not, in itself, establish a deliberate indifference claim.  Id.  See also Czajka v. Caspari, 995 F.2d 870, 871 (8th Cir. 1993) (prison doctor may disagree with inmate's attending physician and such disagreement does not establish an Eighth Amendment claim).  Mr. Caskey has not shown that defendants were "plainly incompetent" or purposely violated his constitutional rights when they provided him with pain medication followed with a cervical epidural block rather than the surgery which Dr. Kidwai characterized as "high risk."  Stanton, 134 S. Ct. at 5; al-Kidd, 131 S. Ct. at 2085; Malley, 475 U.S. at 341.  The court recommends summary judgment be granted to defendants Dr. Regier and CNP Manson on this claim.

Dr. Regier and CNP Manson are also entitled to summary judgment on Mr. Caskey's claim that they were deliberately indifferent to his medical needs regarding their treatment of his narcolepsy condition.  In his amended complaint, Mr. Caskey asserts these defendants refused to properly treat his narcolepsy.  He did not elaborate on this claim, other than to explain he believes narcolepsy is a medical condition but he is receiving his treatment from mental health staff.  Docket 22 at p. 1.

Dr. Davidson confirmed Mr. Caskey's narcolepsy condition and continued his prescription for Adderall shortly after Mr. Caskey's admission to the SDSP.  Docket 61-5, p. 1-2, Docket 62-2 and 62-3.  Mr. Caskey's dissatisfaction arose, however, sometime after he was caught receiving double

prescriptions for Adderall (from both his outside provider, pulmonologist
Dr. Hericks, and the prison mental health staff).  At that time, Dr. Hericks
dismissed Mr. Caskey from care because he was concerned with Mr. Caskey's
"use of high-risk, controlled substances."  Docket 62-4.  After this incident,
prison mental health providers substituted a different medication (Provigil) to
treat Mr. Caskey's narcolepsy condition.   In his deposition, Mr. Caskey
explained that "a lady" changed his medication after Dr. Davidson left and "it's
not okay with me."  Docket 60-2 at p. 4.   One of the most recent (February,
2015) entries in Mr. Caskey's mental health records reveals the mental health
staff increased the Provigil dose at Mr. Caskey's request.  Docket 61-1 at p. 1.
That note also indicates Mr. Caskey's pulmonologist was recommending
Adderall rather than Provigil, but the source of this information is unclear
because by then Dr. Hericks had long ago discharged Mr. Caskey from his
care.  Docket 62-4.

       At most, Mr. Caskey has articulated dissatisfaction with the medical
providers who are treating him and his disagreement with the choice of
medication those medical providers prescribed for his narcolepsy condition
after they determined Adderall was no longer appropriate.  But it has long been
recognized in the Eighth Circuit that a prison doctor's failure to comply with an
inmate's preference does not rise to the level of deliberate indifference. It is well
established that a prisoner does not have a right to a particular or requested
course of treatment.  <u>Long v. Nix</u>, 86 F.3d 761, 765 (8th Cir. 1996).  As for
Mr. Caskey's claim that he was "not okay" with the unnamed medical

provider's decision to switch his narcolepsy medication from his preferred Adderall to Provigil, see Givens v. Jones, 900 F.2d 1229, 1232-33 (8th Cir. 1990).  In that case, the Eighth Circuit found the doctor was entitled to qualified immunity even though he prescribed an antibiotic to which the inmate claimed to be allergic.  "Certainly physicians do not, and should not, necessarily accept as true the medical judgments offered by their patients. They must make treatment decisions on the basis of a multitude of factors, only one of which is the patient's input.  . . . [the inmate] appears only to disagree with [the doctor's] apparent conclusion that the possible adverse effects of the drug were outweighed by its benefits."  While Mr. Caskey claims Dr. Hericks continues to recommend Adderall, in reality Dr. Hericks discharged Mr. Caskey from his care for abuse of that medication.  See also Vaughn v. Lacey, 49 F.3d 1344 (8th Cir. 1995) (prison officials were not deliberately indifferent for failing to give prisoner medications prescribed by a physician who was no longer treating the prisoner, especially when the prison physicians disagreed with the earlier physician's assessment).  Id. at p. 1346.  This court cannot find deliberate indifference in failing to re-prescribe Adderall. Alternatively, Mr. Caskey has not shown that defendants were "plainly incompetent" or purposely violated his constitutional rights when they provided him with Provigil instead of his preferred medication (Adderall) after he was caught receiving double prescriptions for Adderall.  Stanton, 134 S. Ct. at 5; al-Kidd, 131 S. Ct. at 2085; Malley, 475 U.S. at 341.  The court recommends

summary judgment be granted to defendants Dr. Regier and CNP Manson on this claim.

Mr. Caskey's last claim against Dr. Regier is that Dr. Regier discriminated against him because of his HIV positive status and because of his sexual orientation.  He generally asserts Dr. Regier's discriminatory bias influenced his treatment decisions regarding Mr. Caskey during his incarceration.  Docket 1, p. 5.

"The Equal Protection Clause generally requires the government to treat similarly situated people alike."  Klinger v. Department of Corrections, 31 F.3d 727, 731 (8th Cir. 1994)(citing City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985)).  "Dissimilar treatment of dissimilarly situated persons does not violate equal protection."  Klinger, 31 F.3d at 731 (citation omitted).  The first step in an equal protection case is determining whether the plaintiff has demonstrated different treatment than others similarly situated to him.  Absent a threshold showing that he is similarly situated to those who allegedly received more favorable treatment, the plaintiff does not have a viable equal protection claim.  Id.   In Patel v. United States Bureau of Prisons, 515 F.3d 807, 815-816 (8th Cir. 2008), the Eighth Circuit explained that for a prisoner to prevail on an equal protection claim, he "must show that he is treated differently from similarly situated inmates and that the different treatment is based upon either a suspect classification or a fundamental right." Mr. Caskey must further show that the different treatment was "motivated by intentional or purposeful discrimination."  Id.

32

In Klinger, the Eighth Circuit explained that "the similarly situated inquiry focuses on whether the plaintiffs are similarly situated to another group for purposes of the challenged government action." Klinger, 31 F.3d at 731. In Klinger, the female inmates at the Nebraska women's prison filed suit claiming the programming they received was inferior to the programming the inmates at the men's penitentiary in Nebraska received. Id. The Eighth Circuit held that even if the programming in the women's prison was inferior, no equal protection violation had occurred because the female inmates and the male inmates were not similarly situated. Id. They were not similarly situated because the women's prison and the men's prison were very different:

> The female inmates have special characteristics distinguishing them from male inmates, ranging from the fact that they are more likely to be single parents with primary responsibility for child rearing to the fact that they are more likely to be sexual or physical abuse victims. Male inmates, in contrast, are more likely to be violent and predatory than female inmates. Thus, the programs [at the men's and women's prisons] reflect separate sets of decisions based on entirely different circumstances. When determining programming at an individual prison under the restrictions of a limited budget, prison officials must make hard choices.

Id. at 731-32.

Mr. Caskey has not sufficiently demonstrated he is  similarly situated to those who allegedly received more favorable treatment, because as a prisoner who is HIV positive he will clearly need different and/or more specialized medical care than most other prisoners.[10]  He has likewise not specified any

---

[10] In their statement of undisputed material facts, the defendants explain they have retained the services of an infectious disease specialist to manage Mr. Caskey's care. See Docket 59 at ¶ 23. Mr. Caskey has not disputed this fact nor has he challenged the quality of care received by the specialist.

way in which other prisoners (even if they are similarly situated) have received more favorable treatment.

Second, the only fact Mr. Caskey alleged in support of his claim that Dr. Regier's discriminatory bias influenced the manner in which he treated Mr. Caskey's health conditions is a comment he claims Dr. Regier made during a consultation in which Dr. Regier stated "that is why HIV is bad, you have to stop spreading it."  Docket 1 at p. 5.  In other contexts, verbal threats, and sarcastic remarks are not enough to rise to the level of a constitutional violation under § 1983.  Martin v. Sargent, 780 F.2d 1334, 1338 (8th Cir. 1985) (citation omitted); Rustan v. Rasmussen, 208 F.3d 218, at *2 (8th Cir. 2000) (unpublished) (inmate's claim that guards verbally threatened him cannot form the basis of a cognizable § 1983 claim); Story, 782 F.3d at 973 (verbal abuse by correctional officers, even use of reprehensible racially derogatory language, is not by itself unconstitutional racial discrimination unless it is pervasive or severe).  See also, Brown v. Byrd, 2000 WL 1780234 (E.D. Pa. 2000) aff'd, 276 F.3d 576 (3rd Cir. 2001)("while distasteful and inappropriate, discriminatory statements, in and of themselves, do not rise to the level of a constitutional violation under 42 U.S.C. § 1983.").

At most Dr. Regier's comments, assuming they were made, were awkward and insensitive.   As a matter of law, however, they were not an indication of intentional or purposeful discrimination.  Patel, 515 F.3d 815-16.

Alternatively, Mr. Caskey has not shown that Dr. Regier was "plainly incompetent" or purposely violated his constitutional rights when he employed

the services of an infectious disease specialist to treat Mr. Caskey, or advised Mr. Caskey he should not spread the HIV virus.  <u>Stanton</u>, 134 S. Ct. at 5; <u>al-Kidd</u>, 131 S. Ct. at 2085; <u>Malley</u>, 475 U.S. at 341.  The court recommends summary judgment be granted to defendant Dr. Regier as to Mr. Caskey's equal protection claim.

Mr. Caskey's final deliberate indifference claim is that Kayla Thelen and the John and Jane Doe defendants failed to provide him with adequate mental health treatment to deal with the aftermath of defendant Lauseng's alleged sexual assault.  Docket 22 at p. 2.  Once made aware of Mr. Caskey's claims, Kayla Thelen offered to enroll Mr. Caskey in her group therapy class which was designed to help inmates better cope with the past trauma in their lives. Mr. Caskey initially agreed, but before he could join the group, he attempted to harm himself and was transferred to another facility as a result of the incident. Mr. Caskey explained during his deposition he had no intention of joining the group anyway because he opined it would not work for him and he believed it was just a bunch of "special needers."

Though Ms. Thelen could certainly have been more proactive in tending to Mr. Caskey's mental state after the alleged incident, Mr. Caskey conceded Ms. Thelen instructed him to re-contact her if he needed to visit, but he never did so.  <u>See</u> <u>Hartsfield v. Colburn</u>, 491 F.3d 394, 398 (8th Cir. 2007) (no deliberate indifference when prison physicians required inmate to initiate follow-up sick call, and inmate failed to do so).  In <u>Hartsfield</u>, the Eighth Circuit explained that "whether [the prison doctor] should have acted sooner instead of

35

waiting for [the prisoner] to submit the request is at most a question of negligence . . ." Id.  The same is true here.  But because negligence is insufficient to rise to the level of deliberate indifference, whether the defendants should have been more proactive in pursuing Mr. Caskey's counseling needs is not a question of material fact which precludes summary judgment in favor of Kayla Thelen and the Doe defendants.  Anderson, 477 U.S. at 248. Alternatively, Mr. Caskey has not shown that defendants were "plainly incompetent" or purposely violated his constitutional rights when they advised him to return if he needed further therapy and did not proactively offer it when he did not.  Stanton, 134 S. Ct. at 5; al-Kidd, 131 S. Ct. at 2085; Malley, 475 U.S. at 341.   The court recommends summary judgment be GRANTED to Kayla Thelen and the Doe defendants on Mr. Caskey's counseling claim.

## F.   Mr. Caskey's Claims Against Defendant Lauseng Should Proceed to the Discovery Stage.

The court begins with the premise that long before the encounter between Mr. Lauseng and Mr. Caskey, the Eighth Amendment protected a prisoner's right to be free from sexual assault by his guards, and no reasonable prison guard could have believed otherwise.  Kahle v. Leonard, 477 F.3d 544, 553 (8th Cir. 2007) (denying defendants' motion for qualified immunity, collecting cases).

To prevail on his § 1983 cause of action against Mr. Lauseng, however, Mr. Caskey must prove "the violation of a right secured by the Constitution and laws of the United States, and must show that the

alleged deprivation was committed by a person *acting under color of state law."* <u>West v. Atkins</u>, 487 U.S. 42, 48 (1988) (emphasis added). The color of state law requirement is a "jurisdictional requisite for a § 1983 action." <u>Polk County v. Dodson</u>, 454 U.S. 312, 315 (1981).

In his amended complaint (Docket 22) Mr. Caskey alleges defendant Lauseng's sexual assault upon him was cruel and unusual punishment in violation of the Eighth Amendment and that the assault resulted in emotional distress.  Mr. Lauseng argues even assuming  Mr. Caskey's version of the facts is true, Mr. Caskey cannot prevail on the constitutional claim because he cannot show the assault occurred while Mr. Lauseng was acting "under color of state law"-- an essential element of a § 1983 cause of action.   As such, Mr. Lauseng argues the constitutional claim must be dismissed and the pendent state law claims for assault and emotional distress should be dismissed as well.

"The traditional definition of acting under the color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' "  <u>West</u>, 487 U.S. at 49 (quoting <u>United States v. Classic</u>, 313 U.S. 299, 326 (1941)).  A defendant acts under the color of state law when he "abuses the position given to him by the State." <u>Id.</u> at 49-50. Further, "an official may act under the color of law even when he or she encounters the victim outside the conduct of official business and acts for reasons unconnected to his or

her office, so long as he or she employs the authority of the state in the commission of the crime." _United States v. Giordano_, 442 F.3d 30, 43 (2d Cir. 2006).   However, "[a]bsent any actual or purported relationship between the [state official's] conduct and his [or her] duties . . . , the [state official] cannot be acting under color of state law," _Roe v. Humke_, 128 F.3d 1213, 1216 (8th Cir. 1997), as "personal pursuits . . . do not give rise to section 1983 liability." _Pitchell v. Callan_, 13 F.3d 545, 548 (2d Cir. 1994). Courts have recognized "a [state official 's] private conduct, outside the scope of his duties and unaided by any indicia of ostensible state authority, is not conduct occurring under color of state law." _Burris v. Thorpe_, 166 Fed. Appx. 799, 802 (6th Cir. 2006).

There is no bright line rule for distinguishing between personal pursuits and actions taken under the color of state law. There is no single factor that will be determinative, and therefore, the courts examine several factors: "whether the employee was on duty, whether his contact with the victim was caused by or required by his official job duties, or whether the employee actually used state-conferred authority to accomplish the deed." _Giron v. Corrections Corp. of America_, 14 F. Supp. 2d 1245, 1248 (D. N.M., 1998). Further, "it is the nature of the act performed which must be scrutinized and which determines whether the officer acted under the color of law." _Rembert v. Holland_, 735 F. Supp. 733, 736 (1990).   The courts have also found that "more than simple awareness by a plaintiff that a defendant is a state official is necessary to establish that a defendant's

38

actions were aided by any indicia of ostensible state authority." Doe v. Waraksa, 2013 WL 597800, at *8 (D. Conn. Feb. 13, 2013) aff'd, 560 F. Appx. 67 (2d Cir. 2014). Knowledge by the plaintiff of a defendant's status as a state official alone "is not sufficient to convert the actions [the defendant] took in the pursuit of his [or her] private interests into action taken under color of state law." Roe, 128 F.3d at 1217.

In his brief, Mr. Lauseng relies heavily upon Roe v. Humke, 128 F.3d 1213 (8th Cir. 1997) for the proposition that he was not acting under color of state law at the time of the sexual assault. In Roe, the defendant was a local police officer who, as part of his duties, provided security for the school. Id. at 1214. He met his eleven year old victim while sitting outside the school in his patrol car. He regularly saw her at school as part of his duties, and sometimes gave her rides home. While in his patrol car at the school, several times Humke suggested to the victim and her friends that they go to his farm to ride his all-terrain vehicles. The victim agreed and Humke, on a Saturday when he was off duty, came to the victim's home to pick up the victim and her friend. Id. at 1214-15. Humke was in his personal vehicle and not wearing his police badge or uniform. Id. at 1215. Once at his farm, Humke sexually assaulted the victim. Id. The victim testified that the next week at school, Humke gave her a "scary" look from his patrol car and asked if she'd had a good time. She believed this was meant to pressure her not to say anything about what happened. Id. The victim ultimately reported the incident and Humke was fired, criminally charged, and incarcerated. Id.

39

The victim's civil rights suit under § 1983, however, was unsuccessful because the Eighth Circuit found Humke was not acting under color of state law when the sexual assault occurred. Roe, 128 F.3d at 1216.  The court stressed that Humke "was neither actually acting in his official capacity or exercising responsibilities pursuant to state law, nor purporting to so act" at the time the assault occurred. Id.  The court rejected the victim's argument that Humke was acting under color of state law because he abused his position of authority as a police officer to create circumstances under which he could assault her, because it found the victim's "knowledge of Humke's status alone  . . . is not sufficient to convert the actions Humke took in the pursuit of his private interests into action under color of state law." Id. at 1217.  The court concluded that because Humke's sexual assault, though reprehensible, was a "private tort committed by a person acting in a purely private capacity," it was not actionable under § 1983. Id.  at 1218.

Defendant Lauseng hangs his hat upon the Eighth Circuit's conclusion in Roe that a victim's knowledge of the perpetrator's status, standing alone, is not sufficient to find an action was taken under color of state law.  Roe, however, has been distinguished by the Eighth Circuit and other courts in ways which are applicable to this case.

In United States v. Colbert, 172 F.3d 594 (8th Cir. 1999), Colbert was prosecuted under 18 U.S.C. § 242, a statute which imposes a criminal penalty upon anyone who under color of state law, willfully subjects any person to the deprivation of rights secured by the Constitution or laws of the

40

United States.  Mr. Colbert was a police officer who was prosecuted under the statute for beating a prisoner who was incarcerated in a city jail cell.  Id. at 596.  The prisoner knew of Colbert through outside business dealings, and spoke badly of him while incarcerated.  This angered Colbert and motivated him to while off duty, use his authority as a police officer to obtain access to the prisoner's cell, beat him, and threaten to arrest him every time he saw him in the future.  Id.  Colbert appealed his conviction, arguing he was not acting under color of state law when he assaulted the prisoner because he was off duty and his motivation for the beating was purely personal.  Id.  He cited Roe as authority for his argument, but the Eighth Circuit was not persuaded.  Id. at 597.

> We think these facts place the actions of the defendant well within the 'color of law' requirement.  According to the Supreme Court, a defendant acts under color of law when he misuses power possessed by virtue of state law and made possible only because he was clothed with the authority of state law.  West v. Atkins, 487 U.S. 42, 49 (1988).  That standard is more than broad enough to cover what happened here.  The defendant was not on duty at the time, and his motivation was personal, not official, in that his anger at the prisoner arose from a personal cause.  These facts, while certainly not irrelevant, do not alter the essence of the case. . . . There was more than mere access here:  not only did Mr. Colbert's status as a police officer enable him to be in a restricted area of the jail, and to open [the prisoner's] cell, it gave him the authority to remove [the prisoner] from the cell and also to threaten him with future arrest.

Id. at 597.  The Court acknowledged but distinguished Roe:

> Like Mr. Colbert, the officer in Roe was not on duty.  On the other hand, he did not specifically invoke his status as a police officer, he was not in a place where only officers had authority to be; and he did not threaten to use his official authority in the future.  The lines here are necessarily somewhat blurred, but this case falls clearly on the other side of the line from Roe.  In short, we believe

41

there was a sufficient nexus between Mr. Colbert's position as a police officer and his abuse of [the prisoner].

Id.

The district court in <u>G.M. v. County of Beltrami</u>, 2002 WL 31163131 at *5 (D. Minnesota, Sept. 23, 2002) likewise distinguished <u>Roe</u> in denying the defendant's motion for summary judgment, which was based on his argument that the sexual encounter which formed the basis for the plaintiff's claim did not occur while he was acting under color of state law.  In <u>Beltrami</u>, the plaintiff was convicted of drunk driving and placed in a community service program called "Sentence to Service" or STS, which is contracted through the Minnesota Department of Corrections.  <u>Id.</u> at * 2.  Program participants work for the county and their salaries are credited toward paying their fines.  <u>Id.</u> at *1.  The defendant (Cota) was the plaintiff's program supervisor.  <u>Id.</u>

Cota and the plaintiff engaged in sex at Cota's home, which the plaintiff alleged was not consensual.  <u>Id.</u> at *2.  The plaintiff sued Cota, under § 1983, alleging the sexual encounter violated her substantive due process right to bodily integrity.  <u>Id.</u> at *3.  Cota moved for summary judgment because he argued the encounter was consensual and his actions were not taken under color of state law.  <u>Id.</u>  In its analysis, the court noted that sexual assaults can violate the constitution under the due process clause and "[s]uch violations need not occur through physical force, but can be based on mental coercion."  <u>Id.</u> at *4 (citing <u>Rogers v. City of Little Rock, Arkansas</u>, 152 F.3d 790, 797 (8th Cir. 1998)).  The court acknowledged <u>Roe</u>, and stated the plaintiff must "demonstrate a real nexus between the alleged assault and Cota's duties as an

42

STS supervisor." Id. at *4 (citing Roe, 128 F.3d at 1217-18).  Cota relied on

Roe in making his argument he was not acting under color of state law when

he had the sexual encounter with the plaintiff, because the encounter did not

occur while he was on the job, he was not carrying out  a specific state duty,

and he was not in uniform or carrying a weapon at the time.  Id.  The court,

however, was not persuaded because in Roe, even though the defendant was a

police officer, the victim was never subject to his authority.  The Beltrami court

observed that where the victim is subject to the perpetrator's authority, a

nexus can be found between the defendant's position as a state actor and his

abuse of the victim.  It denied Cota's motion for summary judgment:

> In this case, Plaintiff was serving a state imposed criminal
> sentence, and Cota was her supervisor.  He has power over when
> and how she could successfully complete the STS program.
> Plaintiff has presented evidence that she saw Cota socially only
> because she felt pressured by the authority he had over her.  . . .
> Plaintiff was extremely vulnerable.  The court finds that here,
> . . . plaintiff has alleged sufficient facts for the jury to infer a nexus
> between Cota's abuse of his authority and the alleged assault.  See
> Roe, 128 F.3d at 1216.  Because plaintiff's allegations raise a
> genuine issue of material fact as to whether Cota acted under color
> of state law, Cota's motion for summary judgment must be denied.

Beltrami, 2002 WL 31163131 at * 5.

Defendant Lauseng also asserts his actions were not taken under color of

state law because he never threatened to use his position as a correctional

officer, and Mr. Caskey participated in the sex act voluntarily.  Neither of those

assertions, however, are sufficiently clear on this record to warrant summary

judgment in Mr. Lauseng's favor.

43

"The Supreme Court has broadly interpreted the color of law requirement, concluding that [m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with authority of state law, is action taken under color of state law.' " United States v. Giordano, 442 F.3d 30, 42 (2d Cir. 2006) (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  In Giordano, the defendant was, as in Colbert, prosecuted under 18 U.S.C. § 242.  Giordano, 442 F.3d at 33.  Mr. Giordano was the mayor of Waterbury, Connecticut when he sexually abused two minor victims who were relatives of a prostitute with whom Giordano had a long-term relationship.  On appeal, he argued his conviction was invalid because although he was mayor when the actions occurred, they "were clearly a part of and derived from a personal relationship  . . . that was unrelated to and predated his mayoralty." Id. at 43.

The Second Circuit rejected Giordano's argument.  It noted the relevant question was not whether the actual abuse was part of Giordano's duties, but whether the abuse was made possible by his authority.  Id.  "Liability may be found where an official, albeit off duty, nonetheless invokes the real or apparent power of his office.  Thus we have found that officials acted under color of law even when, like Giordano, they came into contact with their victims in the course of their private affairs."  Id. (citations omitted, punctuation altered).  The Giordano court concluded that because Giordano had invoked the power of his office to keep his victims silent, the government satisfied its burden to show he acted under color of state law.  Id. at 45-46.  Viewed in the

44

light most favorable to Mr. Caskey, there is a genuine issue of fact regarding whether Mr. Lauseng abused the power bestowed upon him by the state to transform his actions from purely personal to under color of state law.

Mr. Caskey testified that when he realized it was Mr. Lauseng with whom he was communicating on Manhunt.com, he asked Mr. Lauseng <u>not</u> to come to the apartment.  Docket 56-2, p. 22-23.  He told Mr. Lauseng who he was, and that he was on the CTP.  <u>Id.</u>, p. 23-24.  When, thirty minutes later Mr. Lauseng showed up at the apartment, Mr. Caskey thought Lauseng was there to "cuff him up."  <u>Id.</u> at p. 25.  When counsel asked Mr. Caskey why he did not lock the door but instead opened it, Mr. Caskey said "I knew I was in trouble at that point . . . He's the DOC . . . Yes I could have locked the door, but he was—he was the captain.  I  . . .  could not hide from him.  I'm on CTP."  <u>Id.</u> at p. 25-26.

Mr. Caskey further explained he thought Mr. Lauseng had caught him surfing websites instead of working as he was supposed to on the CTP, and the whole thing was a "set up."  <u>Id.</u> at 27-28.  Mr. Caskey repeatedly stated he did not participate willingly but was influenced by Mr. Lauseng's position with the DOC.  <u>Id.</u>  Though Mr. Lauseng asserts in his brief he did not use his position as a correctional officer to threaten Mr. Caskey or force him into the sex act, Mr. Caskey testified he did not willingly participate (Docket 56-2 at p. 30) and that Mr. Lauseng, as he was leaving the apartment told Mr. Caskey he had "no idea the pull that he has, the authority that he has  . . . and not to say a word to anyone."  <u>Id.</u> at 34.  As in <u>Giordano</u>, if this evidence is believed by a jury it could show that Lauseng <u>did</u> act under color of state law because he used his

45

position as a correctional officer to threaten Mr. Caskey when, as in <u>Giordano</u>, he invoked the power of his office to keep Mr. Caskey silent.

Mr. Lauseng asserts he did not employ the authority of the state because Mr. Caskey engaged in the sex act voluntarily.  In <u>Frietas v. Ault</u>, 109 F.3d 1335 (8th Cir. 1997) the Eighth Circuit recognized there were circumstances under which a prisoner could state a claim for sexual abuse by a guard under § 1983.  <u>Id.</u> at p. 1338.  "[S]uch abuse can, in certain circumstances, constitute the unnecessary and wanton infliction of pain."  <u>Id.</u> (citations omitted, punctuation altered).  The Eighth Circuit rejected the plaintiff's Eighth Amendment claim in <u>Frietas</u>, however, because it found the plaintiff in <u>Frietas</u> failed to prove the nature of the relationship was anything other than consensual.  <u>Id.</u> at 1339.  In the years since <u>Frietas</u>, however, it has been distinguished by many courts.

"[S]ome  . . . courts have recognized that prisoners are incapable of consenting to sexual relationships with a prison official."  <u>Chapman v. Willis</u>, 2013 WL 2322947 at * 6 (W.D. Va., May 28, 2013) (collecting cases).  "The rationale for these decisions rests primarily on the imbalance of control between prison guards and prisoners."  <u>Id.</u>  In <u>Carrigan v. Davis</u>, 70 F. Supp. 2d 448 (D. Del. 1999), for example, the court concluded that an act of intercourse or fellatio between a guard and a prisoner is *per se* a violation of the Eighth Amendment.  <u>Id.</u> at 453.  In reaching this conclusion, the court cited contemporary standards of decency, beginning with its state's legislation. "The United States Supreme Court has recognized that the clearest and most

46

reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures."  Id. at 453 (citing Penry v. Lynaugh, 492 U.S. 302, 331 (1989) (abrogated on other grounds by Atkins v. Virginia, 536 U.S. 304 (2002)).  The Carrigan court noted the Delaware legislature had passed a law criminalizing sexual contact between guards and inmates.[11]  Id.  The Carrigan court also addressed whether consent could be a defense and cited the Frietas case.  Id.  It distinguished Frietas, however, because (among other reasons) "unlike the Frietas court  this court is guided in its decision that vaginal intercourse and/or fellatio is at odds with contemporary standards of decency under the Eighth Amendment by the Delaware legislature's directive making such conduct a felony."  Carrigan, 70 F.Supp.2d at 460.[12]

Frietas was likewise distinguished by the Ninth Circuit in Wood v. Beuaclair, 692 F.3d 1041, 1047-48 (9th Cir. 2012).  Wood also involved a prisoner's claim that he had been sexually assaulted by a guard, but the guard claimed the relationship was consensual.  The Ninth Circuit began its

---

[11] The South Dakota legislature enacted a similar statute in 1996.  See SDCL § 24-1-26.1 which states "Any person employed by the state, or employed within any state prison or other detention facility, who knowingly engages in an act of sexual penetration with another person who is in detention and under the custodial, supervisory, or disciplinary authority of the person so engaging, is guilty of a class 6 felony."

A class 6 felony is punishable by two years' imprisonment, a four thousand dollar fine, or both.  See SDCL § 22-6-1 (9).

[12] Frietas arose out of Iowa.  As of 2005, Iowa was one of fifteen states that did not have legislation which made unforced sexual contact with inmates a felony.  See  https://www.oig.justice.gov/special/0504/ (last checked September 21, 2015).  It appears sexual misconduct with a prisoner remains a misdemeanor in Iowa as of this writing.  See ICA § 709.16.

47

discussion this way:  "[B]ecause of the enormous power imbalance between prisoners and prison guards, labeling a prisoner's decision to engage in sexual conduct in prison as 'consent' is a dubious proposition."  Id. at 1044.  The court acknowledged Frietas but distinguished it on its facts and found it problematic that the Frietas court "utterly failed to recognize the factors which make it inherently difficult to discern consent from coercion in the prison environment."  Wood, 692 F.3d at 1048.  The court recognized many decisions by other courts which have adopted a *per se* rule that prisoners are incapable of consenting to sex with guards.  Id. at 1047 (collecting cases).

> The rationale underpinning these decisions rests primarily on the pronounced dichotomy of control between prison guards and prisoners.  Prisoners have no control over most aspects of their daily lives.  They cannot choose what or when to eat, whether to turn the lights on or off, where to go, and what to do.  They depend on prison employees for basic necessities, contact with their children, health care, and protection from other inmates.  See Carrigan 70 F.Supp.2d at 458-59; see also HUMAN RIGHTS WATCH WOMEN'S RIGHTS PROJECT, *All Too Familiar: Sexual Abuse of Women in U.S. State Prisons,* 5 (1996) (hereinafter "*All Too Familiar,*) (documenting the sexual abuse of prisoners and finding that "[i]in prison, correctional employees have nearly absolute power over the well-being of prisoners.").  The power disparity between prisoners and prison guards is similar to that of an adult over a child or a teacher over a student.  At least one commentator likens the relationship to that of an owner over a slave.  See Brenda V. Smith, *Sexual Abuse of Women in United States Prisons: A Modern Corollary of Slavery*, 33 FORDHAM URB. L.J. 571 (2006) (concluding that parallels exist between the prisoner-guard and owner-slave relationships).  Just as power inequities between adults and minors, teachers and students, and owners and slaves foster opportunities for sexual abuse, so too does the prisoner-guard relationship.  Indeed, sexual abuse in prison is prolific.  Id. (noting that sexual harassment in prison 'is so much a part of the power structure that it is almost invisible.'); Carrigan, 70 F.Supp.2d at 458-61; Cash v. County of Erie, 2009 WL 3199558 at *2; see also, *All Too Familiar*, 407, n. 13 (recognizing prisoners 'cannot

meaningfully consent to sexual relations with staff' and quoting the superintendent of the Bedford Hills Correctional Facility who said: "where you have power over a person, [sex] cannot be consensual . . . you cannot be in the position of an inmate and make that kind of decision . . . eventually, [sexual relations between an inmate and staff person] makes other people feel unsafe."); Laurie A. Hanson, Comment, *Women Prisoners: Freedom from Sexual Harassment—A Constitutional Analysis,* 13 GOLDEN GATE U.L. REV. 667, 667 (1983) (hereinafter "*Freedom from Sexual Harassment.*") ("Sexual relationships between inmates and guards are the product of sexual exploitation and cannot be defined as voluntary.").

Wood, 692 F.3d at 1047.

The Wood court considered but declined to adopt the *per se* rule recognized by many other courts which renders prisoners incapable of consenting to sexual relationships with guards. Id. at 1048-49. Instead, it adopted an approach which explicitly recognizes the coercive nature of sexual relationships in the prison environment. In the Ninth Circuit, when a prisoner alleges sexual abuse by a guard, the prisoner is entitled to the presumption the conduct was not consensual. Id. at 1049. The state may rebut the presumption by showing the conduct involved no coercive factors. Id. Unless the state carries its burden, the prisoner is deemed to have established the fact of non-consent. Id.

Here, Mr. Caskey testified that while he did not physically fight Mr. Lauseng, he asked Mr. Lauseng not to come to the apartment after he revealed his prisoner status, but Mr. Lauseng came anyway. Mr. Caskey testified he engaged in the sex act only because of his fear of Mr. Lauseng's position at the DOC, and Mr. Lauseng threatened Mr. Caskey with his power as a DOC official in an effort to keep Mr. Caskey silent. Docket 56-2, p. 30.

49

Viewing the evidence most favorably to Mr. Caskey, Mr. Caskey has alleged sufficient facts for the jury to infer a nexus between Lauseng's abuse of his authority as a prison official and the alleged assault.  See Roe, 128 F.3d at 1216; Giordano, 442 F.3d at 46-47; Beltrami, 2002 WL 31163131 at * 5.

Because Mr. Caskey's allegations raise genuine issues of material fact, it is recommended to the district court that Mr. Lauseng's motion for summary judgment should be denied. It is further recommended to the district court that Mr. Caskey should be appointed counsel to assist him in conducting discovery and the further pursuit of this sole remaining claim.

## CONCLUSION AND RECOMMENDATION

For the reasons explained above, it is recommended to the district court that the motion for summary judgment by defendants Darin Young, Justin Elkins, Ryan Manson, Eugene Regier, Kayla Thelen, and Jane/John Does (Docket 57) be GRANTED and that defendant Dennis Lauseng's motion for summary judgment (Docket 53) be DENIED.  It is further recommended that should the court adopt the recommendation to deny defendant Lauseng's motion for summary judgment, counsel should be appointed to represent Mr. Caskey.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.

Objections must be timely and specific in order to require de novo review by the District Court.  <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black,</u> 781 F.2d 665 (8th Cir. 1986).

Dated this 29th day of September, 2015.

BY THE COURT:

Veronica L. Duffy
United States Magistrate Judge